1771

The STATE, Respondent v. Grover Lee SMITH, Appellant.

(415 S.E. (2d) 409)

Court of Appeals

*William N. Epps, Jr.* of *Epps, Krause & Nicholson,* Anderson, *for appellant.*

*Attorney Gen. T. Travis Medlock, Asst. Attys. Gen. Harold M. Coombs, Jr.,* and *William Edgar Salter, III,* Columbia, and *Sol. George M. Ducworth,* Anderson, *for respondent.*

Heard Jan. 16, 1992; Decided Feb. 24, 1992.

On Rehearing March 11, 1992.

GOOLSBY, Judge:

Grover Lee Smith appeals his conviction for the murder of Mary Zou Pressley. The issues on appeal relate to Smith's right to a speedy trial, the sufficiency of the evidence to support Smith's conviction, the State's failure to prove motive beyond a reasonable doubt, the admission of certain evidence, and the trial judge's failure to grant a mistrial. We affirm.

I.

We reject Smith's contention that the State denied him his constitutional right to a speedy trial.

The police arrested Smith for Pressley's murder on May 7, 1987. Four months later, the police also arrested Smith for the murder of Ricky Burdette. The grand jury simultaneously indicted Smith for both murders.

The State elected to try Smith for the Burdette murder first. Smith was convicted following a jury trial and the judge sentenced him to life imprisonment.

On February 8, 1988, two weeks after the Burdette conviction, the State *nol prossed* the Pressley indictment with leave to reindict.

About three months after the Supreme Court reversed Smith's conviction for Burdette's murder in *State v. Smith*, 300 S.C. 216, 387 S.E. (2d) 245 (1989), the grand jury on February 27, 1990, reindicted Smith for Pressley's murder. The trial, which began on April 23, 1990, resulted in a guilty verdict. The judge sentenced Smith to life imprisonment.

Smith claims the delay of his trial for the Pressley murder for nearly three years after his arrest "denied [him] his constitutional right to a speedy trial." We disagree.

In *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. (2d) 101 (1972), the United States Supreme Court set forth a four-part balancing test to be applied on an *ad hoc* basis when determining speedy trial questions. The four factors to be considered are: the length of the delay; the reason for the delay; the defendant's assertion of his right to a speedy trial; and the prejudice to the defendant. *Id.* at 530, 92

S. Ct. at 2192, 33 L. Ed. (2d) at 117. South Carolina uses this approach. *State v. Chapman*, 289 S.C. 42, 344 S.E. (2d) 611 (1986).

### A.

Because the trial judge did not state whether the delay he considered was nearly three years, as claimed by Smith, or only ten months, as claimed by the State, we will assume for the purpose of this appeal that the delay was nearly three years.

While length of delay alone is not dispositive, the delay here is sufficient to trigger our review of the other three factors. *See Barker*, 407 U.S. at 530, 92 S. Ct. at 2192, 33 L. Ed. (2d) at 117 (until there is some delay that is presumptively prejudicial, there is no need to inquire into the other factors); *State v. Waites*, 270 S.C. 104, 240 S.E. (2d) 651 (1978) (a two-year and four-month delay held sufficient to warrant further inquiry).

### B.

The burden was on Smith to show "the delay was due to the neglect and willfulness of the State's prosecution." *State v. Dukes*, 256 S.C. 218, 222, 182 S.E. (2d) 286, 288 (1971). We agree with the trial judge. Smith did not satisfy this burden. The delay, so far as the record shows, resulted, not from willful neglect, but from the State's decision to try Smith first for the Burdette murder and from Smith's conviction in that case. *See State v. Ridge*, 269 S.C. 61, 236 S.E. (2d) 401 (1977) (the solicitor has authority to call cases in such order as will facilitate the efficient administration of his official duties). Once Smith was convicted and sentenced to life imprisonment for Burdette's murder, as he was, it became unnecessary, as a practical matter, to prosecute him for the Pressley murder. Because the State did not seek the death penalty for Pressley's murder, an additional life sentence, were it later to be imposed on Smith, would not really have added to his punishment.

The delay in prosecuting Smith for the Pressley murder became material after the Supreme Court vacated Smith's conviction for the Burdette murder. The State thereafter promptly secured a new indictment charging Smith with the Pressley murder and prosecuted Smith therefor.

## C.

The State concedes Smith asserted his right to a speedy trial in this case. He first asserted his right to a speedy trial eight months after his arrest when he learned the case involving the Burdette murder would be tried before this one. He reasserted his right to a speedy trial a week after the Grand Jury reindicted him for the Pressley murder.

## D.

Smith failed to demonstrate any prejudice caused him by the delay.

His argument that he was prejudiced by the delay because the State was able to use the Burdette case as a discovery tool for this trial lacks merit in that Smith received a similar discovery advantage. *Cf.* Rule 5(b)(1), SCRCrimP (rule providing for reciprocal disclosure of evidence by a defendant who has requested disclosure of documents, tangible objects, and reports of examinations and tests from the State).

His argument that he was prejudiced because his witnesses' memories faded also lacks merit because the same disadvantage hampered the State. *Chapman*, 289 S.C. at 45, 344 S.E. (2d) at 613.

Regarding Smith's claim of prejudice because one of the witnesses who testified for him in the Burdette case had died before trial of the instant case, we note that this witness' testimony was nonetheless available to Smith because the witness had testified under oath in the former case. *See Gaines v. Thomas*, 241 S.C. 412, 128 S.E. (2d) 692 (1962) (case discussing the use of former testimony by a witness since deceased). At any rate, we are unable to determine whether Smith was actually prejudiced by the witness' unavailability because Smith made no proffer as to what this witness would have testified. *See Chapman*, 289 S.C. at 45, 344 S.E. (2d) at 613 (the bare assertion of a witness' unavailability is insufficient to warrant the conclusion that the defendant suffered actual prejudice thereby).

Smith's other arguments concerning prejudice are not addressed because they are made for the first time on appeal. *See State v. Bailey*, 298 S.C. 1, 377 S.E. (2d) 581 (1989) (the failure to raise an issue at trial waives the right to argue it on

appeal); *cf. State v. Meyers,* 262 S.C. 222, 203 S.E. (2d) 678 (1974) (an argument on appeal is limited to the ground of objection raised below).

## E.

Based on our review and balancing of the four factors discussed above, we agree with the trial judge that Smith was not denied his constitutional right to a speedy trial. Although there was a delay of nearly three years and Smith asserted his right to a speedy trial, the delay did not involve willful neglect and Smith suffered no actual prejudice because of the delay.

## II.

We find no merit in Smith's contention that "the trial judge erred in failing to grant [Smith's] motions for a directed verdict of not guilty and [Smith's] motion for a new trial [on the ground] there was insufficient circumstantial evidence to establish . . . [his guilt] beyond a reasonable doubt . . . [or] from which his guilt could be fairly and logically deduced."

"It is a well-established rule in criminal cases that unless there is a total failure of evidence tending to establish the charge laid in the indictment, the trial judge's ruling on a motion for a directed verdict of acquittal must stand absent an error of law." *State v. Nix,* 288 S.C. 492, 496, 343 S.E. (2d) 627, 629 (Ct. App. 1986); *see also State v. Davis,* 278 S.C. 544, 298 S.E. (2d) 778 (1983) (where there is evidence tending to establish guilt on a charge, neither the refusal to direct a verdict of acquittal nor the refusal to grant a new trial is error).

In addressing Smith's contention, we view the evidence and its reasonable inferences, as we must, in the light most favorable to the State. *Nix,* 288 S.C. at 496, 343 S.E. (2d) at 629. In determining whether to send a case to the jury on circumstantial evidence, the proper standard to be applied by the judge is as follows:

[T]he judge is concerned with the existence or non-existence of evidence, not its weight; and although he should not refuse to grant the motion where the evidence merely raises a suspicion that the accused is guilty, it his his duty to submit the case to the jury *if there be any substantial evidence which reasonably tends to prove the guilt of the*

> *accused, or from which his guilt may be fairly and logically deduced.*

*State v. Edwards,* 298 S.C. 272, 275, 379 S.E. (2d) 888, 889 (1989) (emphasis theirs), *cert. denied,* 493 U.S. 895, 110 S. Ct. 246, 107 L. Ed. (2d) 196 (1989).

We therefore examine the evidence in accordance with these principles, realizing the State is entitled to all favorable inferences where the evidence is conflicting.

The victim, Mary Zou Pressley, was Smith's wife's grandmother. About a month before the murder, Smith's wife left him to live with her paramour, Howard Kirkland. Smith had custody of the Smith's three children.

Pressley was murdered at her trailer on May 3, 1987. The pathologist estimated that the time of death was between 12:00 noon and 12:00 midnight. An autopsy revealed she died from two "blows" to the head. The pathologist's opinion was "a death by an ax."

Between 9:40 and 9:45 p.m. on May 3, 1987, Smith left his work area. Before leaving, however, he asked a co-employee to clock him out at his normal quitting time of 10:30 p.m.

Smith's workplace was fifteen miles from Pressley's trailer and around twenty-five minutes away. Smith's defense was alibi.

The next morning around 8:30 a.m., while at a local bar, Smith told Victor Latham, "Me and my wife are separated [and] the bad part about it[ ] is those kids' grandmother is laying over there dead, and I can't take them to the funeral home."

Later that morning, Smith was the first lunch customer at a local restaurant near Pressley's trailer. Upon arrival, he filled his plate at the buffet.

Although he did not usually do so, Smith sat at a booth with a direct view out the window. His view included the road where Pressley's trailer was located. He stared out the window for about an hour while eating very little.

Between 11:00 and 11:30 a.m., a delivery person first discovered Pressley's dead body at her trailer. This was approximately three hours *after* Smith told Latham that Pressley was dead.

Around noon, the rescue squad passed by the restaurant. At this point, a waitress noticed Smith was no longer there.

Shortly thereafter, Smith showed up at Pressley's trailer, where the rescue squad had gone. He stated, "I just happened to pass here on my way ... to get something to eat."

The next morning, a neighbor of Kirkland saw a faded blue, older-model car that she said "may have been a Nova" parked by Kirkland's car. She also saw a man reaching into Kirkland's car from the driver's side window. As the man was doing so, the neighbor heard a "thumping" noise. Smith drove a faded blue, older-model Nova.

About noon that same day, the lieutenant learned of the pathologist's opinion that the murder weapon was an ax. He shared this knowledge with the other investigating officers. It was not, however, revealed to anyone outside the sheriff's office.

Around 2:20 p.m., the sheriff's dispatcher received an anonymous phone call. The caller stated he knew who killed Pressley and gave the address and license tag number of Kirkland. The caller also stated he had seen the murder weapon earlier that day on the front seat of Kirkland's car. He identified the weapon as an ax with blood on the handle.

Just ten minutes later, Smith arrived at work and told a co-worker that somebody had called the sheriff's department and said Smith's wife and her boyfriend killed Pressley.

Later that afternoon, somewhere between 4:15 and 5:00 p.m., Smith told another co-worker he was going to phone his kids. Smith then went into the office where the phone was located.

During this same time period, between 4:30 and 5:30 p.m., an anonymous caller phoned another sheriff's dispatcher and implicated Kirkland in Pressley"s murder.

Later that night, Kirkland consented to a search of his car. The police found an ax in a plastic bag under the driver's side seat of the car. The car apparently had not been moved for some time.

The ax had blood on it, as well as hairs that were consistent with Pressley's.

The next morning, Smith went to the sheriff's office at the request of the investigating officers to answer questions. He spoke with the dispatcher who received the first anonymous call. She immediately recognized his voice as that of the anonymous caller.

Finally, around May 25 or May 26, 1987, while Smith was out on bond for the Pressley murder, he went to visit the co-worker who clocked him out at 10:30 p.m. on the day Pressley was murdered. He said he came to congratulate the co-worker on his baby girl. The co-worker explained he had a baby boy.

Smith then asked the co-worker if the police had talked to him. When the co-worker said "yeah," Smith asked what he told them. The co-worker responded that he told the truth.

We therefore hold there is substantial evidence from which it can be fairly and logically deduced that Smith killed Pressley with malice aforethought, either express or implied. *See* S.C. Code Ann. § 16-3-10 (1976) (defining murder as "the killing of any person with malice aforethought, either express or implied"); *cf. State v. Landin*, 472 N.W. (2d) 854 (Minn. 1991) (the lack of incriminating physical evidence such as eyewitnesses, fingerprints, and fiber samples does not necessarily undermine a guilty verdict); *People v. Howard*, 209 Ill. App. (3d) 159, 154 Ill. Dec. 56, 568 N.E. (2d) 56 (1991) (the absence of fingerprints and blood stains did not preclude the finding of sufficient evidence to support a conviction for murder).

### III.

We reject Smith's argument that "the trial court erred in failing to grant [his] motions for a directed verdict of not guilty and his motion for a new trial [on the ground] the State, having undertaken to prove that [he] had a motive to kill . . . Pressley, failed to prove such motive beyond a reasonable doubt."

In this state, it is well settled that motive is not an element of murder and, therefore, the State need not prove motive. *State v. Hartley*, — S.C. —, —, 414 S.E. (2d) 182, 187 (Ct. App. 1992) (Sanders, C.J., concurring). Smith, however, claims "if the State attempts to establish motive as a part of a chain of circumstantial evidence against the accused . . . [that] tends to corroborate the accused's guilt, then motive becomes most material[ ] and . . . like the other circumstances upon which the State relies must be proven to a reasonable and moral certainty."

For support, Smith relies on a portion of *State v. Takis*, 204 S.C. 140, 28 S.E. (2d) 679 (1944) that states:

[W]here . . . the State under[takes] to prove motive as a part of its chain of circumstantial evidence against the ac-

cused, *and without which there would [be] no "corroboration of the primary fact of guilt,"* then motive be[comes] most material, and [must be brought to the test of strict proof]. . . .

*Id.* at 143, 28 S.E. (2d) at 680 (emphasis ours).

Even assuming that this portion of *Takis* has not been overruled by *State v. Edwards*, there was, as the recital of the evidence above reflects, substantial corroboration of Smith's guilt aside from motive.

## IV.

We also reject Smith's argument that "the trial court erred in permitting [the sheriff's dispatcher] to identify the voice of a May 5, 1987 [anonymous] telephone caller as that of . . . Smith [because the dispatcher] had no training in voice identification[,] she had never heard [Smith's] voice prior to the alleged voice identification[,] and she could not state with certainty that the voice on the telephone was that of [Smith]."

For some time, a witness' testimony of identification of a person by having heard his voice has been regarded as legitimate and competent evidence to establish identity in criminal cases. *State v. Plyler*, 275 S.C. 291, 270 S.E. (2d) 126 (1980). We are aware of no authority in this state that requires a witness either to be an expert or have training in voice identification before so testifying. *See Plyler, Id.* at 294, 270 S.E. (2d) at 128 (sufficient testimony as to recognition of the voice warrants its admission); 29 Am. Jur. (2d) *Evidence* § 368, at 417 (1967) (testimony by a witness that he recognized the accused by his voice is admissible, provided the witness has some basis for comparison of the accused's voice with the voice he identifies as that of the accused).

We hold there was sufficient testimony here as to the recognition of Smith's voice. The dispatcher heard the anonymous caller's voice on the afternoon of May 5, 1987. She described the caller as a white male, around forty years old with a "very country and rugged, scratchy like voice." The voice particularly stuck out in her mind because it "was so country [and] kind of had a ring to it."

Less than twenty-four hours later, Smith came to the sheriff's office and told the dispatcher he was there to talk to two of the detectives. The dispatcher immediately recognized

Smith's voice as that of the anonymous caller. She turned around and told her partner. She then went and told the detectives Smith was there to see them and he sounded like the man she talked to the day before.

The dispatcher did not know that Smith was supposed to come in that morning. She testified she was ninety percent sure that he was the anonymous caller.

We find no merit to Smith's assertion that the identification was error because the dispatcher had never heard Smith's voice prior to the alleged telephone conversation. *See State v. Porter*, 251 S.C. 393, 162 S.E. (2d) 843 (1968) (the identity of the party with whom the witness talked need not be known at the time of the conversation, but is sufficient if knowledge enabling the witness to identify the other party is later obtained), *cert. denied*, 393 U.S. 1079, 89 S. Ct. 859, 21 L. Ed. (2d) 773 (1969); 29 Am. Jur. (2d) *supra* § 368, at 417 (the basis for comparison of the accused's voice with the voice identified as that of the accused may be satisfied if the witness acquires his knowledge of the accused's voice after the event testified to by the witness).

Despite the briefness of the dispatcher's later conversation with Smith, and due to its closeness in time to the anonymous call as well as the distinctiveness of Smith's voice, we find no error in the voice identification. *See State v. Stewart*, 275 S.C. 447, 272 S.E. (2d) 628 (1980) (witness' identification of a robber based on the robber's distinctive voice was properly admitted when the voice was heard again by chance six months after the robbery); *Porter*, 251 S.C. at 398, 162 S.E. (2d) at 846 (it is proper to permit a witness to testify as to a telephone conversation with a man whose voice he subsequently recognizes as that of the defendant); *Massey v. State*, 160 Tex. Crim. 49, 266 S.W. (2d) 880 (1954) (a witness was allowed to testify about a telephone conversation he had with the defendant, although he did not identify the voice as the defendant's until he met him a year later); *Davis v. State*, 200 Ind. 88, 161 N.E. 375 (1928) (any doubt as to whether a witness could sufficiently identify the defendant as the voice heard during a telephone call after hearing his voice on only one occasion four months after the telephone call went to the weight of the evidence rather than to its admissibility), *overruled in part on other grounds, Stephenson v. State*, 205 Ind. 141, 186 N.E. 293

(1933); *Collins v. State*, 77 Tex. Crim. 156, 178 S.W. 345 (1915) (the length of time one was acquainted with the person whose voice he claimed to recognize goes to the weight of the testimony, not its admissibility); *Commonwealth v. Hayes*, 138 Mass. 185 (1884) (court held it was proper for a witness to testify that a voice she heard in her yard on the night of the attempted crime was that of the defendant, although she had heard him speak on only one earlier occasion and then only a few words); *see generally*, Annotation, *Identification of Accused by his Voice*, 70 A.L.R. (2d) 995, 1002, § 3 (1960); *cf.* 32 C.J.S. *Evidence* § 546(20), at 145 (1964) (a witness whose knowledge of a person's handwriting was derived from seeing the person write on only one occasion, and then only his name, a mark, or a cipher letter may state an opinion as to whether a particular document was written by such person).

We also find no error in the dispatcher describing the ▇ caller as a white male, approximately forty years old, with a "very country and rugged, scratchy like voice" even though she was not an expert in identifying voices. *See State v. Cofer*, 73 Idaho 181, 249 P. (2d) 197 (1952) (testimony by a witness that he could identify the defendant by his unusual voice and peculiar accent was sufficient); *People v. Sullivan*, 290 Mich. 414, 287 N.W. 567 (1939) (court held it was proper for a witness to identify the defendant by his manner of speaking in a very low undertone); *Rhea v. State*, 104 Ark. 162, 147 S.W. 463 (1912) (a witness may recognize and know the difference between the voices of persons of different nationalities and races); 29 Am. Jur. (2d) *supra* § 368, at 417 (the basis of the witness' voice identification may be that the accused's voice has some peculiarity or characteristic making it easily recognizable).

Finally, we discern no error because the dispatcher was not absolutely certain Smith was the anonymous caller. Her mere uncertainty did not affect the admissibility of her identification of Smith's voice. *See State v. Steadman*, 216 S.C. 579, 59 S.E. (2d) 168 (1950) (the credibility of voice identification testimony was for the jury), *cert. denied* 340 U.S. 850, 71 S. Ct. 78, 95 L. Ed. 623 (1950); 29 Am. Jur. (2d) *supra* § 368, at 417 (the general rule is that mere uncertainty on the part of a witness identifying an accused by voice recognition affects only the weight and not the admissibility of the testimony); *see*

*generally*, Annotation, *supra*, at 1006, § 4.

We do not address Smith's other arguments concerning the voice identification because they are raised for the first time on appeal. *Bailey*, 298 S.C. at 6, 377 S.E. (2d) at 584; *Meyers*, 262 S.C. at 225, 203 S.E. (2d) at 679.

## V.

We find no basis for reversal because of the trial judge's admission in evidence of Smith's purported statements that are reflected in a typewritten document and handwritten notes. Smith complains the documents are not verbatim accounts of his interrogation by investigating officers and were therefore inadmissible.

When Smith went to the sheriff's office to answer questions, the officers did not record the interrogation because Smith said he did not want to make a written statement. Instead, one of the officers took notes.

Several hours after the interrogation, the three investigating officers met. Based on their memories and the notes taken, they reconstructed part of the interrogation in question and answer form. The document that they prepared is four and one-half typewritten pages and contains more details than the page and one-half of hand-written notes.

The officers admitted the typewritten document and the handwritten notes are not verbatim accounts of everything said, but they testified what is in each document is accurate.

Smith's argument regarding the documents not being verbatim accounts of his interrogation goes to the weight rather than to the admissibility of the documents. *See State v. Sullivan*, 277 S.C. 35, 282 S.E. (2d) 838 (1981) (arguments that go to the weight of evidence rather than to its admissibility are for the jury to resolve).

Moreover, even if the judge erred in admitting the typewritten document and the handwritten notes in evidence because they are not verbatim accounts of what Smith said during interrogation, the error was harmless since other evidence established the same facts. *See State v. Blackburn*, 271 S.C. 324, 247 S.E. (2d) 334 (1978) (the admission of improper evidence is harmless where the evidence is merely cumulative to other evidence).

Here, the investigating officers testified without objection

as to what Smith told them during the interrogation. They even referred to the typewritten document and the handwritten notes when responding to questions. The information contained in these documents was cumulative to other evidence presented at trial.

Finally, when Smith himself testified, he went over the alleged inaccuracies between what is in the documents and what he actually said. Our review of these alleged inaccuracies reveal that they are insignificant and bore little, if any, relation to the primary evidence of Smith's guilt. *See State v. Jolly*, 304 S.C. 34, 402 S.E. (2d) 895 (Ct. App. 1991) (a defendant seeking reversal based on an error in the admission of evidence has the burden of showing that the evidence was prejudicial).

## VI.

The trial judge committed no abuse of discretion in admitting the ax and a photograph thereof in evidence. *See State v. Moultrie*, 283 S.C. 352, 322 S.E. (2d) 663 (1984) (the admission of evidence in a criminal prosecution is within the discretion of the trial judge and will not be disturbed on appeal unless an abuse of discretion is shown). Smith alleges error because "there was no competent evidence [that] established that the ax was the murder weapon."

The State, however, introduced the following testimony regarding the ax: the police found the ax where the anonymous caller said it would be; the ax had blood on it as well as hairs consistent with the victim's; the victim's wounds were consistent with the ax; and the dispatcher identified Smith as the anonymous caller who said the ax was the murder weapon and who told the dispatcher where it could be found.

We hold the testimony concerning the ax was sufficient to afford a basis for forming a reasonable inference that Smith used the ax to murder Pressley. *See State v. Quillien*, 263 S.C. 87, 207 S.E. (2d) 814 (1974) (all that is required for the admission of demonstrative, connecting evidence is that there be sufficient evidence to afford a basis for a reasonable inference on the point in issue). Positive, direct, or certain evidence linking the ax either to Smith or to Pressley's murder is not required. *Quillien, Id.* at 91, 207 S.E. (2d) at 816.

## VII.

The trial judge also committed no abuse of discretion in denying Smith's motions for a mistrial. *See State v. Wasson*, 299 S.C. 508, 386 S.E. (2d) 255 (1989) (a motion for a mistrial lies within the sound discretion of the trial judge whose ruling will not be disturbed on appeal absent an abuse of discretion amounting to an error of law). Smith based his mistrial motions on the admission of certain testimony by two of the State's witnesses—testimony that he argues "[was] highly prejudicial and . . . denied [him] the right to a fair and impartial trial."

### A.

During direct examination, the State asked Smith's co-employee, "Was there anything wrong with one employee punching out for another employee?" The co-employee responded, "Yes sir[,] came to find out it was a federal offense."

At this point, Smith's attorney objected because the witness was accusing Smith of a federal offense with which he had not been charged. Smith's attorney also moved for a mistrial on the ground that the statement impermissibly attacked Smith's character. He claimed a curative instruction would not cure the resulting prejudice.

The trial judge sustained the objection but denied the motion for a mistrial. He then gave the jury the following instruction:

> I sustained the objection to the last line of questioning. I'm going to ask you to disregard any reference to the witness' characterization of his conduct being a "federal offense" in clocking another employee in or out. That whole line of questioning, I have determined, is to be stricken from the record. You will totally disregard it, not give it any weight whatsoever. It is no longer a part of the record, therefore, you should disregard it in it's [sic] entirety. Treat it as if you have never heard it. This has no value. It is not properly in evidence.

We deem this comprehensive instruction adequately cured any error in the co-employee's statement. *See State v. Dawkins*, 297 S.C. 386, 377 S.E. (2d) 298 (1989) (an instruction

to disregard incompetent evidence usually is deemed to have cured the error in its admission); *see also Wasson,* 299 S.C. at 510, 386 S.E. (2d) at 256 (a mistrial should not be granted except in cases of manifest necessity and ought to be granted with the greatest caution).

### B.

Yvonne Shaw, another state witness, testified to Smith's presence and conduct at a local restaurant on the day Pressley's body was discovered. On cross-examination, Smith's attorney asked, "Why do you remember so much of what went on on May the 4th, 1987?" The witness responded:

> Because that was the day Mrs. Pressley's body was found, and when we got the word that her body was found, and you are not going to want me to say this, but when I —.

At this point, Smith's attorney objected, giving no grounds except, "I didn't ask that." The witness indicated that she had not finished her answer, and the trial judge instructed her to do so. She stated:

> The reason I remember distinctly the day it was, was because when we got word that Mrs. Pressley had been murdered I said, Oh, Dear, Lord, that's what was wrong with Grover. He killed her.

At this point, Smith's attorney renewed his previous objection of "I didn't ask that" by stating, "Note my objection." He raised no other ground to exclude the witness's testimony by way of objection, request to strike, request for curative instruction, or motion for mistrial.

At the end of the State's case, Smith made a mistrial motion on the ground that Shaw's answer was not responsive to his question. The trial judge denied the motion.

Smith renewed the mistrial motion at the end of all the evidence, making the additional argument that a curative instruction could not cure the prejudice resulting from the unsolicited "adlibbed remark," a remark that he claimed was "calculated to prejudice" Smith. The trial judge denied this motion also.

We first note that Shaw's answer was responsive to the question. Her answer explained why she remembered the events of May 4, 1987, so well. The trial judge, therefore, properly overruled the objection, the only objection timely raised at trial.

On appeal, Smith argues Shaw's testimony constituted speculation. We need not reach this issue, however, because Smith did not make this argument to the trial judge. *Bailey*, 298 S.C. at 6, 377 S.E. (2d) at 584; *cf. Meyers*, 262 S.C. at 225, 203 S.E. (2d) at 679.

Smith also argues Shaw's statement was so prejudicial that it could not be cured by an instruction. Assuming this is true, we find no error. There is no need to give a curative instruction until an objection to evidence is sustained and the objecting party timely requests a curative instruction. Here, the trial judge overruled the objection.

We note Smith claimed prejudice for the first time when he made a motion for a mistrial at the end of all the evidence. A mere assertion of prejudice, however, is too general to preserve any issue for appeal. *State v. Millings*, 247 S.C. 52, 145 S.E. (2d) 422 (1965); *State v. Bostick*, — S.C. —, 414 S.E. (2d) 175 (Ct. App. 1992).

Assuming Smith's mere assertion of prejudice was sufficient, his mistrial motion was improper. A mistrial motion is not a substitute for a timely and specific objection during a witness's testimony. *State v. Lynn*, 277 S.C. 222, 284 S.E. (2d) 786 (1981). Here, the issue of "prejudice" was not argued as a ground for the objection and, therefore, afforded no basis for a subsequent mistrial motion.

### C.

Finally, in regard to the denial of the motions for a mistrial concerning the statements of both witnesses, even if there were error, we find no prejudice in light of the substantial other evidence supporting Smith's guilt. *See Wasson*, 299 S.C. at 510, 386 S.E. (2d) at 256 (the burden on a motion for a mistrial is upon the movant to show not only error, but also resulting prejudice).

Affirmed.

SANDERS, C.J., and SHAW, J., concur.